## ATLAS GLASS CO. v. SIMONDS MFG. CO. et al.

(Circuit Court, W. D. Pennsylvania. February 19, 1900.)

1. PATENTS—INFRINGEMENT—GLASS-BOTTLE MOLDS.
   The Windmill patent, No. 416,389, for a mold for glass bottles, etc., construed, and held infringed by machines known as the "Powers Machines," for mechanically pressing and blowing glass articles.

2. SAME—MACHINES FOR MOLDING AND BLOWING BOTTLES.
   The Rylands patent, No. 416,376, for machinery for the manufacture of glass bottles, which consists of a rotary table to facilitate the use of molds of the Windmill type, held infringed by the Powers machine as to claim 11, and not infringed as to claim 1.

3. SAME—TERM—LIMITATION BY PRIOR FOREIGN PATENT.
   To constitute a "foreign patent," within the meaning of Rev. St. § 4887, which, under such section, will limit the term of a subsequent American patent, it is not essential that the foreign grant shall be the equivalent of a patent granted by the United States, either as to the length of term or the breadth of the exclusive rights secured to the grantee, but it is sufficient if exclusive rights are granted for a definite term.

4. SAME.
   Prior to the enactment of patent legislation in Denmark, in 1894, monopolies in inventions in that country were secured by royal letters patent, granted by grace of the king, through the ministry of the interior, on petition therefor; and such patents gave to the grantee a monopoly to "make and allow to make" the thing patented, for a stated term, on condition that he carried out his invention within a year and continued to employ it. Held, that such a grant was in præsenti, and the condition a condition subsequent, and that it was a "foreign patent," within the meaning of Rev. St. § 4887, whose term limited that of a subsequent patent granted by the United States for the same invention.

In Equity. Suit for infringement of patents. On final hearing.

William L. Pierce, for complainant.

James Negley Cooke and James I. Kay, for defendants.

BUFFINGTON, District Judge. This bill was filed by the Atlas Glass Company, owner of the four patents hereinafter specified, against the Simonds Manufacturing Company, John J. Powers, et al., for alleged infringement thereof by the manufacture and sale of certain machines for mechanically pressing and blowing glass, known as the "Powers Machines." Pending the suit the two patents granted to Blue were withdrawn, and the charge of infringement limited to claims 3 to 7, inclusive, of patent No. 416,389, granted December 3, 1889, to James Richard Windmill, assignor to Dan Rylands, for a mold for glass bottles, etc., and claims 1 and 11 of patent No. 416,376, granted December 3, 1889, to Dan Rylands, for machinery for the manufacture of glass bottles. The defenses thereto are noninfringement, invalidity of the patents, and that by reason of the expiration

of two prior Danish patents both these patents had lapsed before the bringing of this suit. During the pendency of this bill the Swayzee Glass Company of Indiana, the S. M. Bassett Glass Company, and the Gilchrist Jar Company of New Jersey, desiring to purchase and remove certain machines from this district, were, on their several petitions, made defendants. In the case of U. S. Glass Co. v. Atlas Glass Co. (C. C.) 88 Fed. 493, this court had before it for consideration on the charge of infringement what is known as the "Atlas Glass Machine." The patents under which it was built were not involved in that issue, but the mechanical and novel features of the machine were fully considered and there discussed. From the opinion of the court, the relation of that machine to the prior art will be seen. In a general way, it may be said to be a co-operative device, in which Blue, the patentee, has, in addition to and in conjoint action with his own devices, embodied the molds of Windmill and the revolving table of Rylands. The result has been the production of a machine which was revolutionary in character in the art to which it belongs. It was the first means devised by which bulged glass articles were successfully pressed and blown mechanically. It produced a new article in commerce,—a machine-made, bulged-glass vessel. It largely increased the capacity of factories over the old hand and lung process. The Windmill patent is the foundation on which this advance is built. The device is fully set forth in the patent:

"The apparatus consists, essentially, of a sliding mold, in which the pressing of the glass article is effected, and a second or outer mold surrounding the sliding mold, in which second mold the pressed article is blown, and the required form given to it."

The sliding press mold is not hinged, but "consists of a cylinder having a capacity or mold of the required shape made in it; the said sliding mold working through an opening in the base plate of the apparatus." The blow mold is thus described:

"In the base of the apparatus the blowing mold is supported; the said mold being divided vertically into two halves, hinged together at the back; the said halves, when closed, being held together by a catch."

At the top of the blow mold is a neck mold, in which the neck of the bottle is formed and retained during the entire operation. The specification states:

"The top of the blowing mold is provided with a neck or contraction in which the neck of the glass article being made is formed. * * * The said blowing mold, b, is furnished at top with the neck or contraction, b², in which the neck of the glass jar or bottle is formed."

In operation, this sliding press mold is "first raised into the outer blow mold. * * * The halves of the blowing mold are next closed and fastened together." The glass is then charged into the press mold, and by pressing a plunger therein the melted glass is pressed into the form of the mold; a portion being also forced into the neck-ring section of the outer or blow mold. The plunger is then withdrawn, and the press mold dropped through the base plate. This leaves the press blank held in situ by the neck-ring section of the blow mold. The open bottom of the blow mold, through which

the press mold has sunk, is then closed by a slide, and the press blank blown to shape in the blow mold.

A study of the prior art shows that Windmill first disclosed in this patent three things: First, a combined co-operative compound press and blow mold; second, a sliding press mold; and, third, means for successfully pressing and blowing bulging glass articles in situ and without manipulation. The mold type here shown was neither the press mold of the old art, the blow mold of such art, nor an aggregation of the two. The press mold is a solid piece, as compared with the hinged structure of the old art. By its fixed concentric relation to the neck ring, and its sliding capacity, it is fitted to present the charge to the plunger in the place it remains during the entire operation, and, on withdrawing, leaves the press blank in a place and condition to be subjected to blow action. So, too, the blow mold, by its fixed concentric relation to the neck ring, is functionally adjusted to envelope the press blank and subject it to blowing action in situ. And the neck ring, by its fixed concentric relation to both press and blow mold, forms a new co-operative device and connecting link in the art. Now, while the patent drawings show the blow mold and the neck ring are integral, yet it must be noted that the essential functional relation between them is not that they are integral, but that they are fixedly concentric. When they are integral, they must, ex necessitate, be concentric, and so fulfill the vital functional purposes of the device; but it is also clear that if they are cut in horizontal section, but still remain fixedly concentric, the necessary functional capacity still exists. The blow mold then being composed of two sections, each with separate, individual functions, to wit, the one pressing the neck, the other blowing the body, it is clear the lower or blowing section has no functional part or capacity in forming the press blank or pressing the neck. The specification discloses no operation or part sustained by the blow-mold section during the pressing, and, from observation, it is clear none could be performed, save conservation of heat, and serving as a point of engagement, through its neck-ring section, to hold the press mold in alignment. So understood,—and we think this is the plain teaching of the patent,—it is clear to us that, while the Powers machine varies the form, it still employs the vital characteristic features, of the Windmill device. It uses substantially the same means to perform the same work. In Powers' mold we find the same lower or blow-mold section, and the same upper or neck one. They are not integral, but cut in horizontal section. But they bear a fixed concentric relation to each other, just as they do in Windmill; and, as a result of such fixed relation, they co-operate and perform the same blowing operation in precisely the same way as in the Windmill device. The press mold of Powers is of the solid, unhinged type first shown by Windmill. It is a sliding one, and has the fixed concentric relation to the neck ring. In its rise into engagement with the press ring, in its position during pressing, and in its receding and leaving the press blank in situ and in the grip of the neck ring, its movements and their results are identical with those of Windmill. The only difference is that the size of the

press mold is such as to prevent the blow mold from enveloping it. But, as such increase of thickness would conserve heat, it is obvious that any results in that line obtained by the enveloping blow mold of Windmill would thus be obtained. The absence of the blow mold also prevents charging before the press mold is raised. With these two incidental and nonfunctional differences of construction, we are of opinion the mold of Powers is substantially the same as Windmill, and that it accomplishes the same result in substantially the same method, and by the use of substantially the same means. We are therefore of opinion infringement has been made out.

The patent of Rylands concerns the use of a series of molds of the Windmill type on a rotary table. Thereby the output can be very materially increased. Rylands' device shows a circular table permitting rotary action around a central pillar, a series of compound molds, a pressing plunger, and a blowpipe. The molds shown are of the general type of Windmill, and have a sliding press mold, a neck ring and blow mold, all of which are concentric, and the neck ring or mold holds the glass in situ during the operation. The table carries several of these molds, each of which, co-acting with a plunger and a blowpipe, separately produces a wholly machine-made, bulged-glass article at each revolution. Practically, the only element of skill on the part of operatives was determining the quantity of glass charged into the press mold. We agree with the statement of complainant's expert, who, in describing the Rylands' device, said:

"In short, the table may be considered as a mechanical link which united the press mold, the blow mold, the pressing plunger, and the blowpipe. It mechanically brought all these parts into co-relation, whereby each performed its separate and individual function to produce a completed article, and without changing the initial position of the blank."

It is not here necessary to enter into a description of the specific means used by Rylands; for infringement of but two claims is charged, and these involve but few elements. Claim 1 is as follows:

"In a bottle-making apparatus, the table, 10, capable of intermittent rotary movement, and carrying the sectional mold, 11, successively into the charging, pressing, and blowing positions, in the manner and for the purposes described."

It will be noted the table of the claim is one "capable of intermittent rotary action," and is one of carrying the section mold, 11, successively into the "charging, pressing, and blowing position." The rotary action is intermittent. There are stops, positions, stations, as contrasted with continuous movement. These stops or stations are defined, we think, as the charging, pressing, and blowing positions, respectively. It is in this way alone we give effect to the terms employed. The limitation of intermittent in connection with the term "carrying the mold successively into the charging," etc., "positions," implies that such positions are the successive stops which make the rotary movement intermittent. And, indeed, such carrying forward of the mold into the charging, pressing, and blowing positions successively, and a stop at each such station for the purpose of carrying, pressing, and blowing, are shown in the device, and are essential to its use. In the Powers table we find a different action in these particulars. While the table has an intermittent rotary

movement, yet it does not carry its mold into the pressing position at all. In point of fact, its single press mold is stationary, and is not ,carried by the table, but the neck mold is carried to the press position. Then the press mold is charged, and by means of a lever, wholly independent of the movement of the table, it is carried into the press position, and from thence withdrawn. The press mold not being carried to its charging position by the table, and such action being, from the construction of the table, impossible, it follows that this claim does not cover the respondent's device.

The other claim involved (the eleventh) is for "the combination, with a bottle mold, of the pressing plunger, 9, carried by ram, 4, and the rotating table, 10." As already stated, we are of opinion the bottle mold of this combination is of the same general type as the Windmill, and also of the complainant. The pressing plungers of Rylands and Powers are substantially the same. It is true, Powers uses a double-headed one, but this difference is mechanical, and in no sense functional. The mechanical equivalent of ram, 4, is found in the sliding carriage of the Powers mechanism; and the rotating table, 10, of the claim, which is defined in the specification as "a table capable of intermittent rotary movement around the central pillar, 1," is used by Powers. We are therefore of opinion infringement is shown.

The two patents considered above were, as we have seen, granted to Rylands on December 3, 1889. It now appears that prior thereto Rylands had, on October 1, 1889, obtained in Denmark an "eneret," or grant of monopoly for making the Windmill mold, and on November 1, 1889, another for making the Rylands table. The term of protection covered by these grants expired prior to the bringing of this suit, and the infringement therein charged. It is alleged that these grants were prior foreign patents, which, under Rev. St. § 4887, limited the term of the subsequent American patents to the seven-years protection granted in Denmark. The question is novel. It seems that prior to 1894, and when these grants were made, there was no legislation in Denmark providing for the grant of patents for inventions. What was termed "eneret," or monopoly, was granted by the grace of the king, by royal letters patent. It was obtained by petition, on payment of fees. The course of procedure is this (stated in 1 Abb. Pat. Laws of All Nations, 159; 4 O. G. 319):

"Inventions are protected by royal letters patent granted through the ministry of the interior, in accordance with rules prescribed by the traditional practice of that department. A person who wishes his invention to enjoy 'eneret,' or monopoly, must address to the ministry of the interior, accompanying his demand by detailed specifications and drawings. The ministry forwards these papers to the Polytechnic School, with a request that the director will report on the applicant's scheme. The director, after consulting, if necessary, the professors of the institute, reports to the ministry whether the alleged invention is new and deserving of protection. He also stated the period for which, in his opinion, the 'eneret,' or patent, should be granted. The ministry always adopts the director's conclusion. It is understood that a patent will be allowed whenever the alleged invention really contains something novel in principle or practice. Generally speaking, the applicant's request is granted. The patent is forfeited (1) if it is shown that a similar invention has been used in Denmark before; or (2) if the patentee does not carry out his invention within the year, and continue to employ it."

An examination of the letters patent in this case shows that the grant, which is simply "to make and allow to make machines," etc., is narrower than the American statutory patent, which (Rev. St. § 4884) confers "the exclusive right to make, use, and vend." It would seem, also, that under the construction given by the courts of Denmark, which grants, any other person was free to import a machine made elsewhere, and use the same, without liability to the grantee of the royal patent. Wunstrup v. Minister of War and Finance, High Court of Justice in Copenhagen, Record, p. 653; Testimony as to Danish Law, Eberth, p. 639. It is therefore urged that a grant so narrow and restricted is not a "foreign patent," as provided in section 4887, Rev. St. After much thought and full consideration, we cannot accede to this contention. That congress meant that only such patents of other countries should be regarded as granted the precise protection afforded by an American one is not reasonable. The wide difference in the scope and protection afforded by the patents of various countries, the liberality and encouragement given to inventors by some countries, and the restricted privileges granted in others, must have been in view when congress considered them as a general class, and styled them "foreign patents." There is nothing definite or descriptive, in itself, in the term "patent." As applied to our American inventions, it may be regarded as a grant issued to fulfill the constitutional provision "of securing for limited times to inventors the exclusive rights to their respective discoveries." The length of the term and the breadth of the exclusive rights are subjects of legislative definition. The vital, substantial features of a patent for an invention are the exclusiveness of the right granted and the definiteness of the term. Such protection was given by the letters patent of the king of Denmark. The term is seven years, and the exclusive right is "to make and allow to make." It is quite clear that a United States patent would be none the less a patent, in the ordinary acceptation of that term, if the length of the term were by act of congress shortened to seven years, and the scope of the exclusive right limited to making alone. By parity of reason, it is equally clear that an invention is none the less "patented in a foreign country," and made the subject of an exclusive grant, because the exclusive right granted is simply "to make and allow to make," and the term for but seven years. In constructing the grants in this case, which are "on condition that he [the patentee], within two years, to be reckoned from the date of this, our allowance, here in the kingdom, has brought the invention named to execution, and later combines [continues?] with it," we are of opinion the grant of exclusive privilege was in praesenti, and the provision cited was a condition subsequent. But, being subsequent and not precedent, that condition has no effect on the present question. The Danish grant must be deemed to be for seven years, without reference to its possible lapse or forfeiture under the condition subsequent. Pohl v. Brewing Co., 134 U. S. 386, 10 Sup. Ct. 577, 33 L. Ed. 953. Such being the case, this bill must be dismissed, since the Windmill and Rylands patents have lapsed by reason of the expiration of the prior Danish ones. Let a decree be drawn.