## GENERAL ELECTRIC CO. v. E. H. FREEMAN ELECTRIC CO.

(Circuit Court, D. New Jersey. May 15, 1911.)

1. PATENTS (§ 167*)—CONSTRUCTION—GENERAL AND SPECIFIC CLAIMS.
    Where a patent contains specific claims for the one form of structure described in the specification and shown in the drawings, and also broad and general claims, the latter are not to be so limited as to make them a mere repetition of the specific claims.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 167.*]

2. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — INCANDESCENT LAMP SOCKET.
    The Sargent patent, No. 665,582, for a lamp socket, which relates to the insulation of the cap of the shell of an incandescent lamp socket, was not anticipated, and discloses invention. Also held infringed.

3. PATENTS (§ 27*)—INVENTION—EFFECT OF SIMILAR DEVICES IN OTHER ARTS.
    Invention may exist in a patented device notwithstanding the existence of devices more or less similar in other arts.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32; Dec. Dig. § 27.*]

In Equity. Suit by the General Electric Company against the E. H. Freeman Electric Company. On final hearing. Decree for complainant.

Samuel Owen Edmonds, for complainant.
Melville Church and D. P. Wolhaupter, for defendant.

CROSS, District Judge. The bill of complaint filed in this cause originally embraced three patents, two of which, however, have been

eliminated, leaving for consideration patent No. 665,582, for a lamp socket, issued January 8, 1901, to Howard P. Sargent, assignor to the complainant. Of the 15 claims therein contained, 1, 11, and 15 only are in issue, and are as follows:

"1. In an article of substantially the character described, the combination with a cap provided with interior retaining means, of an insulating-lining made yieldable so that it can be forced over the retaining means, which lining is held thereby in the interior of the cap.

"11. In an article of substantially the character described, the combination with a cap of projections extending in the interior thereof, and an insulating-lining adapted to be sprung over said projections, said lining being held by said projections within the cap.

"15. In an article of substantially the character described the combination with a cap, having a hole in its crown for the passage of the wires leading to the lamp, of projections extending in the interior of the cap, and an insulating-lining having a hole registering with the hole in the cap, said lining being held by said projections within the cap."

The controversy herein is confined to the validity of the patent. No question is made, or could be made, upon the question of infringement, as the defendant's device is in all respects like that of the patent in suit. The invention has to do with the insulation of the cap of an incandescent lamp socket. It does not relate to the socket casing as a whole, which consists of an inclosing shell for the socket body and a detachable cap closing the upper end of the shell. Nor does it interfere with or effect the insulating base of the socket, but its function is confined, as already stated, to insulating the cap of the shell in what is claimed to be a cheap, effective and durable manner. The patentee describes his patent as follows:

"A lining A of insulating material, such as ordinary insulating-fibre, and having an opening F registering with the opening in the cap, is interposed between the metallic cap B and the upper portion of the insulating base of the socket to prevent current from flowing from any of the interior contacts or wires to and through the metallic cap, whereby danger of fire or of persons receiving shocks therefrom is avoided. The use of this lining A does not interfere in any manner with the use of the lining of the shell V, well known to those skilled in art. The difficulty of properly securing the lining A in position is due to the fact that ordinary securing means would pass through the cap and lining and would defeat the very object for which the lining is interposed."

He then described the particular method by which this is accomplished. The problem which confronted Sargent is well stated by complainant's counsel in the following language:

(1) "Within the limited space inclosed by the socket shell must be arranged a block of solid insulation by the peculiar fashioning of which the metallic parts may be insulated both from each other and from the shell."

(2) "Within that limited space those metallic (and, therefore, conducting) parts must be compactly and permanently mounted and arranged to perform their various functions."

(3) "Provision must be made for access to the interior of the socket shell to enable the wiremen to properly connect the incoming and outgoing conductors to the screws or binding posts through which current is supplied to the filament, also to make repairs to the snap-switch mechanism by which the current is turned on and off."

(4) "Under the rules of the fire underwriters, provision must be made, even in these small sockets, when used as pendants, for sufficient open space

within the socket-casing for a knot in the insulated conductors to bear the weight of the socket, the lamp, and sometimes the shade-holder and shade."

(5) "Despite the limitation as to size, the mountings or supports for the various parts must be so strong and durable as to resist comparatively rough usage, which might otherwise result in bringing together parts of opposite polarity, creating an arc, and either shocking the user or possibly setting fire to nearby objects."

[1] The method described by the patentee in his specification, however, is not the one generally followed in manufacture by the complainant, but which is nevertheless one well within the scope of the claims above set forth. Those claims are broad and general and may not be so limited by other and specific claims as to make the two classes coextensive. Ryder v. Schlichter, 126 Fed. 487, 61 C. C. A. 469. That case was decided by the Circuit Court of Appeals of this circuit, and at page 491 of 126 Fed., page 473 of 61 C. C. A. it uses the following language:

"It is evident that the express terms of the claim do not limit the patentee to a particular device, and therefore the construction adopted by the court below practically rewrote the claim and in effect expunged it from the patent; for to limit it to the one form of structure described in the specification and shown in the drawings necessarily introduced into the claim such modifications of the language used by the inventor as turned it into a substantial, and therefore a superfluous, equivalent of the claims preceding. These three claims are concerned with the particular structure described by the drawings and the specification, and to confine the fourth claim, which is drawn broadly, to such a structure, denies to the claim any effect whatever. This, we think, goes too far. It requires us to suppose that the inventor prepared a claim whose words do not mean what they say, and should be so modified as to make them a mere repetition of other claims, and that the patent office also knew that the words were to be read with limitations that are not stated, and nevertheless, allowed the claim to stand."

The patent called for the use of a lining of a somewhat elastic or "yieldable" substance, which could be sprung into position over projections in the cap, which would conform to its contour and thus constitute with the cap a substantially unitary structure. Such a cap lining is easily and inexpensively made and applied, occupies but little space, is durable and practically fixed and rigid when once in position, and, as stated above, it met the main requirements of the art. Furthermore, the device was proven to be of great utility, and has practically supplanted all others. It may be added that it appears that, when the testimony in this cause was taken, its sales had already amounted to upwards of 2,000,000.

[2] The patents mainly relied upon as anticipations are one to George B. Painter, No. 771,569, issued October 4, 1904, and another to Sigmund Bergmann, No. 484,580, issued October 18, 1892. Considering them in the order above named it may be said of the Painter patent that it was never put to successful use. Moreover, it does not anticipate the complainant's invention. This is, to some extent at least, admitted by the defendant's expert in the following language:

"This cover or insulating lining, however, is not fastened to the cap or retained therein so that it requires special handling. Accordingly, as compared with this Painter patent, the subject-matter of claims 1, 11, and 15, differs, because of the interior projections carried by the cap to hold the cap lining in place. Also, the cover Q of Painter is described as being made

of porcelain instead of 'yieldable' material, as claim 1 of Sargent requires; and hence, it could not be 'sprung' into place as required by claim 11 of Sargent."

The insulating cap lining called for by the Painter patent was of porcelain and necessarily rigid and unyielding, and could not be forced or sprung over the retaining projections like those of the Sargent patent. It is claimed, however, on behalf of the defendant, that in the specifications of the Painter patent, it appears that the porcelain cap lining is held in place therein in such manner that the cap lining forms with the cap, a unitary structure. Admitting this, it is still apparent that the means, which secures the lining to the cap of the patent in suit, could not, for the reasons already given, be applied to a porcelain lining. In Painter's specification, he speaks of the porcelain lining as expanding the spring metal of the cap, whereby the lining is held firmly in position in the cap. But if this were so, it is not the method of Sargent. Moreover, in the only exhibit of the Painter socket which appears in the case, the lining, made of vulcanite rather than porcelain, was not fastened in the cap, but on the contrary was perfectly loose. Again, it should be noted that in the original application for the Painter patent, which was filed prior to that of Sargent, no method of fastening the lining in the cap was specified, and the complainant contends that the means therefor provided by the amended specification was an afterthought and really suggested by Sargent's invention, which was put on the market in March 1900, his invention having been made, according to the evidence, in December 1899. Painter's original application was filed October 9, 1899, and renewed September 22, 1900, and his patent issued, as above stated, October 4, 1904, or nearly three years after Sargent's. This contention seems plausible, but it is unnecessary to determine the fact definitely, since Painter does not, in my judgment, anticipate the salient and controlling features of the patent in suit.

Turning to the Bergmann patent, it appears that the defendant's expert, while admitting that there is a difference between the subject-matter of the Sargent patent and the Bergmann construction, states that the difference is attenuated, although he admits that claims 11 and 1 of Sargent are distinguishable from Bergmann, in that claim 11 requires the insulating lining to be adapted "to be sprung over said projection," and claim 1 that the lining should be "made yieldable so that it can be forced over the retaining means." He insists, nevertheless, that none of the claims discloses any substantial novelty. In making this statement, however, he relies upon the admitted fact that a disc or film of cork or other resilient substance, as a lining for a cap for a bottle or for a thimble, were old in the art, and that the fastening of such linings therein by means of shoulders or projections was also old. This is all quite true, but it by no means establishes that the application of a resilient lining to an electrical lamp-socket cap by like means does not show invention. The arts referred to are not only not analogous, but are as widely separated as they well could be.

The complainant's expert differentiates the Bergmann construction from Sargent's in the following language:

"The Bergmann patent, No. 484,580, does not designate or illustrate any particular material of which its cap insulation is to be made. That insulation is massive; it forms a 'washer' mechanically separate from the insulating block by which the supply wires are supported and insulated from each other and from the metal parts of the socket; but it is designed for mechanical combination with that insulating block and confinement thereto by suitable clamping means, while the socket is assembled and in use. In one of the surfaces of this heavy washer is cut a slot for a circuit-controlling switch or key, held in position for use by the insulating base or block which is placed above it and prevents it from escaping from the slot when pressure is applied to turn it, or from dropping out of the slot of its own weight when the socket is suspended either from a cord or a rigid fixture. The two masses of insulation are then clamped together and to the metal cap by a screw which passes through and makes contact with that cap, and then engages with a threaded metal piece molded into the interior of the block of insulation. This insulating washer is not described as resilient, and there is no occasion for anything but the rigidity which is illustrated in the drawings and indispensable in the parts which furnish the bearing surface for the long key shaft. It is locked from rotation by the perforating clamping screw, and from rotation and vertical motion by the metal shell and its insulating lining, both of which are screwed down upon its upper edge, as a necessary step in the process of assembling the socket. Certainly it is not sprung into position, but is placed there as a separate element which accompanies neither the metal cap nor the insulating base. Whenever the socket is taken apart, this heavy insulating washer is necessarily liberated and falls away from the cap and from the insulating base which carries the circuit wire terminals. In short, the Bergmann structure does not anticipate the combination of claim 1 of the patent in suit, for it has no 'interior retaining means,' nor any 'insulating lining' which is 'yieldable so that it can be forced over the retaining means,' nor any locking device in the cap. Neither has it the corresponding elements of claim 11 or claim 15 of the patent in suit."

Sargent's device, as already shown, is manifestly of great utility and commercial value. The Patent Office examiner gave him broad claims without question, and I see no reason why they should be emasculated or destroyed by anything disclosed by Painter and Bergmann. The cap-insulators of those patents could not appropriately be called linings. They are objectionably thick and heavy, occupying considerable space, are absolutely without resiliency and are attached, if attached at all, by different and inferior means. The problem met and overcome by Sargent was by no means so simple as the defendant contends. The space in which he had to install his work was small and had to be economized. The insulation admittedly had to be not only perfect, durable, and inexpensive, but easily and permanently adjusted, and so adjusted, as to form with the cap a unitary structure. [3] The electrical art did not disclose what he accomplished, and it would be manifestly unfair to defeat his patent by importing from the bottle-stopper or thimble arts or others like them, the devices above mentioned. Invention may exist notwithstanding such anticipations. Cases frequently cited upon this point are Western Electric Co. v. La Rue, 139 U. S. 601, 606, 11 Sup. Ct. 670, 35 L. Ed. 294; Potts v Creager, 155 U. S. 597, 607, 15 Sup. Ct. 194, 39 L. Ed. 275. See, also, National Tube Co. v. Aiken, 163 Fed. 254, 259, 91 C. C. A. 114, and General Electric Co. v. Bullock Mfg. Co., 152 Fed. 427, 433, 81 C. C. A. 569, 575.

The complainant is entitled to a decree, with costs.