## FOAMITE–CHILDS CORPORATION v. PYRENE MFG. CO.

Circuit Court of Appeals, Third Circuit.
October 8, 1929.

No. 3882.

Buffington, Circuit Judge, dissenting.

Oscar W. Jeffery and Harry G. Kimball, both of New York City, for appellant.

Fish, Richardson & Neave and Maxwell Barus, all of New York City (William G. Mahaffy, of Wilmington, Del., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. The plaintiff-appellant brought suit against the defendant on May 9, 1924, and charged it with infringing claims 1, 3, and 6 of the United States letters patent No. 858,188 issued to Mr. A. G. Laurent of St. Petersburg, Russia, on June 25, 1907, for a hand fire-extinguishing apparatus, now owned by the plaintiff. As the bill was filed only a few weeks before the patent expired, the plaintiff did not ask for an injunction.

It is more difficult to extinguish a fire of burning oil, varnish, gasoline, naphtha, or other volatile substances than it is to put out an ordinary fire of burning wood. Water, thrown on an oil fire, being heavier than oil, sinks to the bottom of the oil instead of blanketing the top and keeping air from the fire. If oil is burning in a tank or container and a large quantity of water is thrown on it, the oil will rise to the top, overflow the tank, and the fire will spread. If oil is confined in a tank, it will generate gas, explode, burst the tank, and thus cause the fire to spread. Steam and certain gases may be used for putting out fires, but their efficiency is limited to use when the fire is in a chamber or confined space. When explosions blow out windows or make openings, their effectiveness ceases. Sand or sawdust mixed with soda deadens the flame, but the difficulty of applying these in sufficiently large quantities and the intensity of the radiant heat from oil fires restrict their use. The parties to this suit claim to be able to put out oil fires with the apparatus which they respectively use and describe in the following language. The defendant says of its apparatus:

"The soda and acid extinguisher ejects 2½ gallons of water; Phomene ejects 20 gallons of fire-fighting foam, and this foam is effective on burning liquids as well as dry materials.

"Phomene extinguishes burning oil, enamel, tar, wax, grease, shellac, lacquers, inflam-

mable solvents or chemicals. Wherever such materials are used or stored, Phomene is an absolute essential, and. in nearly every industry these inflammable materials are used; therefore we recommend Phomene for general protection, to replace the old style soda and acid extinguisher.

"Phomene is labeled by the Underwriters' Laboratories, and endorsed by insurance authorities generally as a substitute for the soda and acid extinguisher. Furthermore, Phomene is endorsed for many hazards where the soda and acid extinguisher would not be acceptable."

The plaintiff says of its apparatus:

"It is capable of delivering between eight and ten times the capacity of the extinquisher, that is, if our extinguisher had a capacity of three gallons, we would carry three gallons of liquid to the fire, but on inversion or operation, the device would deliver perhaps 25 to 30 gallons of a fire extinguishing medium. * ͜ * * That makes a form of foam, and in addition forms sufficient pressure to throw that foam through the nozzle of a distance of say 25 to 30 feet, which enables the operator to stand at a good distance from the fire and not be affected by the heat of it and still puts him in a position to extinguish the fire."

Claim 1 of the patent follows:

"A fire-extinguishing apparatus, comprising a receptacle containing separated gas-producing fire-extinguishing substances and a foam-producing substance which causes the substances to produce a gas-filled foam simultaneously with the evolution of gases."

Claim 3 differs from claim 1 in that it states that the foam-producing substance is *mixed* with one of the fire-extinguishing substances. Claim 6 is identical with claim 3, except that it specifies an extract of licorice root as the foam-producing substance. Each claim is for an apparatus. The formation of the foam, the patent says, is produced by adding to one of the liquids any appropriate viscous foam-forming substance. There are many of such substances, but "the most advantageous is extract of licorice root."

The patent does not purport to be the first to disclose practical methods and devices for producing and utilizing gas foam as a fire extinguishing agent. A method of extinguishing fires by projecting against burning surfaces lather-like bubbles was described and broadly claimed by Elmer Gates in his patent, No. 749,374, issued January 12, 1904. One of the plaintiff's witnesses in describing the "gas-filled foam" of the patent said: "You will get a good idea of it if you compare it to shaving lather." What Laurent claims is an apparatus and not a method nor a foam-forming substance. These were old.

The apparatus of Gates and the prior art had no mixing chamber; neither does the defendant's. The District Court found that the plaintiff's does have a mixing chamber, and its presence in the plaintiff's apparatus distinguishes it from the receptacles of the prior art and from the defendant's apparatus. There seems to be no question about the fact that the device of the defendant does not have a mixing chamber. Infringement depends upon whether or not the claims in issue of the plaintiff's patent have a mixing chamber in the apparatus which they describe and claim.

Claims 2, 5, and 7 state that the fire-extinguishing apparatus has a "mixing chamber." Claims 3, 4, and 6 do not expressly contain a "mixing chamber," but state that the foam-producing substance is *"mixed"* with one of the fire-extinguishing substances. Claim 1 does not state that it contains a "mixing chamber," nor does it say that the foam-producing substance is "mixed" with one of the fire-extinguishing substances, but says that the receptacle, which all the claims have, contains "gas-producing fire-extinguishing substances and a foam-producing substance which *causes the substances to produce* a gas filled foam simultaneously with the evolution of gases." In the claims which do not specifically mention the "mixing chamber," but state that the foam-producing substance is "mixed" with one of the fire-extinguishing substances to cause a gas-filled foam to be produced simultaneously with the evolution of gases, the question arises as to whether or not the mixing is done in the receptacle when these substances come together in a "mixing chamber" or elsewhere and otherwise.

The patent says that:

"This invention has for its object to provide a hand fire extinguishing apparatus of the kind in which two or more liquids, arranged separately in a common container, are caused to mingle in the case of fire so that they generate gases which expel the liquids in a powerful jet.

"In appliances of this kind hitherto employed, when the appliance was utilized, the two or more liquids have been completely mixed one with the other, so that the pressure within the container became relatively high and it was consequently necessary to make the container strong. Further, it was also impossible to stop the jet before the apparatus was emptied, even when the issue became no longer necessary, so that the appliance had

to be recharged after use on every occasion before it was possible to use it again.

"The defects are obviated by means of the present invention, owing to the fact that it sprays *foam* instead of liquid. The weight of this foam being from 8 to 10 times lighter than water, a jet of foam from 6 to 8 meters high can be produced with a pressure of but one atmosphere, and the container may therefore be formed from ordinary tin or galvanized iron by soldering. In addition to this, the mixture of the two or more liquids forming the foam takes place in such a manner that only the quantities required for the formation of a certain quantity of foam are mixed together, and further mixing takes place gradually as this foam is sprayed out. As a result of this, the operation of the appliance may be caused to cease at any moment, and it may be re-started at any time as long as the apparatus contains any of the liquids. The formation of the foam is produced by adding to one of the liquids (or to both of them) any appropriate viscous foam-forming substances. There are many such substances, but the most advantageous is extract of licorice root (succus liquiritæ)."

The apparatus of this invention sprays foam rather than liquid, and this would indicate that the "mixing" was done in the apparatus. The foam is produced in the receptacle containing the different substances in separate compartments, and "the mixture of the two or more liquids forming the foam takes place in such a manner that only the quantities required for the formation of a certain quantity are mixed together, *and further mixing takes place gradually as this foam is sprayed out.*" So the foam is produced from mixing the two substances in the receptacle, not in the compartment containing either substance, but in a separate compartment or "mixing chamber," and is then *"sprayed out."* We are compelled to interpret the limitation of the claims in issue, 1, 3, and 6, and the prior art, the disclosures in the specification, and the claims themselves, drive us to the conclusion that all three claims in issue contain a receptacle of some kind called a "mixing chamber" in which the substances are mixed and "cause a gas-filled foam to be produced simultaneously with the evolution of gases." The claims in accordance with the general practice state the same thing in different language. Moreover, figures 1 and 2 distinctly show mixing chambers. Figure 4 is not so clear, but it seems to show a section which is used as a mixing chamber. Figures 3 and 5 are simply horizontal sections of 2 and 4. The learned District Judge said of Figures 4 and 5: "Though the apparatus of Figure 4, of which Figure 5 presents a different view, has no mechanically or structurally complete mixing chamber, it has, as I understand the drawing, a section so blocked off by the arrangement of its parts that a complete mixing chamber is formed through the aid of the soda solution when the apparatus is placed in a horizontal position for use. It then functions as if the mixing chamber were mechanically and structurally complete." This interpretation is not only the logical conclusion from all the facts disclosed in the patent, but is necessary in order to sustain the claims, distinguish the patent from the prior art, and uphold the Patent Office.

In distinguishing his patent from the Murray and Nuhring patent of the prior art, the patentee said of that patent: "The construction is quite different from applicant's (Laurent's) apparatus as it (apparatus of Murray and Nuhring) has no mixing chamber and of course no narrow passage discharge openings between the mixing chamber and the several compartments of the apparatus."

It is thus seen that the patentee and the Patent Office regarded the restricted communication of the liquid chambers and the separate mixing chamber or its equivalent such as is illustrated in Figure 4 for causing slow mixing with consequent production of foam within the apparatus so that the foam could be sprayed out as foam when generated, as features which distinguished his apparatus from those of the prior art. None of these distinguishing characteristics are found in the defendant's apparatus.

If the claims be not susceptible of the interpretation that they are not for a function or result, apart from the mechanical devices employed, which is not patentable, Fuller v. Yentzer, 94 U. S. 288, 24 L. Ed. 103; Corning v. Burden, 15 How. 252, 268, 14 L. Ed. 683, then the performance of that function must be limited to the particular means described in the specification for the production of a gas-filled foam "simultaneously with the evolution of gases." In thus interpreting patents, it often becomes necessary to refer to the specification and read it into the claim, as the Supreme Court did in the case of Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 557, 18 S. Ct. 707, 717, 42 L. Ed. 1136, when it said: "In thus reading the specification into the claim, we can adopt no other construction than to consider it as if the auxiliary valve were inserted in the

claim in so many words, and then to inquire whether the defendants make use of such valve, or its mechanical equivalent." The specification of the Laurent patent describes an apparatus containing a mixing chamber, and does not disclose any other kind of apparatus by means of which the result of the invention is obtained. Consequently, when the patentee says that the foam-producing substance is mixed with one of the fire-extinguishing substances to cause a gas-filled foam, or which causes the substances to produce a gas-filled foam simultaneously with the evolution of gases, the claim must be interpreted as including or referring to the "mixing chamber" which the specifications mention as an essential part of the apparatus, for these two substances must come together and be mixed in something in order to produce a gas-filled foam, and the patent shows nothing else than a "mixing chamber."

In the defendant's apparatus, the liquids are completely mixed one with the other so that the pressure within the container becomes relatively high. This requires the container to be made strong, as was the apparatus of Gates and the prior art, while the plaintiff's apparatus may be made of ordinary tin.

When no more foam is needed to extinguish the fire in the apparatus of plaintiff's patent, the apparatus may be tilted to its original position in which the mixing ceases and the process of producing the foam stops, but in the defendant's appliances the process once started continues until all the liquids are expelled as in the appliances of the prior art "hitherto employed."

The learned District Judge dismissed the bill of complaint because he reached the conclusion that the defendant did not infringe the claims in suit because they must be limited to chemically operated foam extinguishers which, though perhaps not having mechanically complete mixing chambers, nevertheless are constructed with a chamber sufficiently complete to enable the apparatus to operate as described in the patent, and that the defendant's extinguisher was not so constructed. We think that he correctly interpreted the claims in issue of plaintiff's patent and the defendant's apparatus. Consequently the defendant did not infringe, and the decree dismissing the bill is affirmed.

BUFFINGTON, Circuit Judge (dissenting). The extinguishing of a fire of oil, varnish, gasoline, naphtha, or other volatile substances presents difficulties which do not exist in putting out the ordinary fire by water. Water thrown on an oil fire, being the heavier of the two, sinks to the bottom of the oil instead of blanketing the top.. If the oil is burning in a tank or container and a large quantity of water is thrown thereon, it causes the oil to rise, overflow the tank, and spreads the fire. If the oil is confined in a tank, explosions from the generated and tank-contained gas burst the tank and spread the fire. Steam and certain gases could be used, but their efficacy was limited to use when the fire was in a chamber or confined space, but when explosions blew out windows or made openings, the effectiveness of these agencies ceased. Sand or sawdust mixed with soda deadened flame, but the difficulty of applying sufficient quantities and the intensity of the radiant heat from oil fires made their use restricted. In fact, prior to the work of the two companies to which we later refer, water seemed to be the only agency used for fire extinguishing, for in the so-called "chemical engines," the portable chemical extinguishers of soda and acid, with which we were familiar for a generation, water is the extinguishing agent; and it was thrown on the fire by the gases formed from its separated chemicals when united by the inversion of the machine.

For the extinguishing of oil fires, and incidentally of other fires, two companies prior to 1924, and some ten other companies since that time, have furnished a simple, light, portable, and effective apparatus which can be instantly used, which dispenses with water and ejects foam which rests on the top of the oil and so blankets the flame. By the tilting of this light machine of two or three gallon capacity, two separated chemicals, one of them mixed with licorice, intermingle and simultaneously form bubbles and eject from 25 to 30 gallons of fire-blanketing foam a distance of 25 to 30 feet.

Referring to its apparatus, which it calls Phomene, and contrasting it with the extinguishers with which we are familiar, one of the companies in language incident, it is true, to praising one's own product, but in fact shown by the proofs to be the case, says:

"The soda and acid extinguisher ejects 2½ gallons of water; Phomene ejects 20 gallons of fire-fighting foam and this foam is effective on burning liquids as well as dry materials.

"Phomene extinguishes burning oil, enamel, tar, wax, grease, shellac, lacquers, inflammable solvents or chemicals. Wherever such materials are used or stored, Phomene is an absolute essential, and in nearly every industry these inflammable materials are used;

therefore, we recommend Phomene for general protection, to replace the old style soda and acid extinguisher.

"Phomene is labelled by the Underwriters' Laboratories and endorsed by insurance authorities generally as a substitute for the soda-and-acid extinguisher. Furthermore, Phomene is endorsed for many hazards where the soda and acid extinguisher would not be acceptable."

The other company by proof shows like efficiency for its apparatus:

"It is capable of delivering between eight and ten times the capacity of the extinguisher, that is, if our extinguisher had a capacity of three gallons, we would carry three gallons of liquid to the fire, but on inversion or operation, the device would deliver perhaps 25 to 30 gallons of a fire extinguishing medium. * * * That makes a form of foam, and in addition forms sufficient pressure to throw that foam through the nozzle a distance of say 25 or 30 feet, which enables the operator to stand at a good distance from the fire and not be affected by the heat of it and still puts him in a position to extinguish the fire."

As the sales by one of these companies of such a foam extinguisher grew from 100 in 1918 and $600,000 worth in 1919 to an aggregate of $1,400,000 up to 1927, and as the other company has sold large quantities in the two years in which it has dealt in foam extinguishers, it will be seen that we are dealing with a highly useful, unique, portable, at hand, and better apparatus for the extinguishing of oil fires at their start than the art previously had.

Turning next to the origin of such foam extinguisher, the proofs show that in 1913 Charles H. Meigs, who had been in the extinguisher business for some thirteen years, went to Germany, and there saw a fire put out by a foam extinguisher. "I observed that the foam which was expelled from the extinguisher flowed on top of a burning oil surface and extinguished the fire very rapidly. * * * I thought it would be a wonderful thing for the American market." He bought one, brought it back with him, and thus, and there is no contradiction of his testimony, "originated the idea of the production of the foam type of extinguisher in this country." Describing this German machine he testified:

"It was the usual European type of extinguisher made of steel instead of copper. It has no hose as the American extinguishers have, but had a fixed outlet and it had an inner tube, inner compartment, and that was fixed in the extinguisher. The top cap was removable. It had a stopple which fell off on the inversion of the extinguisher. * * * I never had any of those German chemical charges but I learned afterwards that they used many different foam-making materials, but principally licorice."

The machine was marked patented, but without identification as to number or date. Meigs then went to Washington, made such search for the foam type machine as he himself could, and found none. He thereafter re-designed the German machine, had some made, and put them on the market about 1916, and sold about 100. In 1917 the business was taken over by the Foamite Fire Extinguisher Company, and 2,000 were sold. Additional capital was put in and patent attorneys employed. Search by them brought to light that a patent for a foam extinguisher, No. 858,188, had in 1907 been granted to one Laurent, a subject of Russia, and that according to the records of the Patent Office it was owned by a German company. They were then advised by their attorney that their extinguisher infringed the Laurent patent. The war prevented the Foamite Company from taking any steps to acquire the patent or a license. It continued the infringement which it had unconsciously been doing. Immediately on the close of the war Meigs went to Germany to buy the Laurent patent. After protracted search, the German company, which had gone out of business, was found, and, after protracted negotiations, the patent was bought in 1918 by the Foamite Fire Foam Company which had succeeded to the business of the Foamite Fire Extinguisher Company. The proofs show that in that year some 7,000 of the extinguishers were sold, and in 1919 some 15,000. By later transfers the patent passed to the Foamite-Childs Company, the successor to the business; and, with the exception of the infringement by the Irwin Company, which ended by the buying of said company and of several other companies which ceased on notice, the assignees of the Laurent patent were the only makers and venders in the country of a foam extinguisher until 1922, when the other company, the defendant, put its Phomene extinguisher on the market.

Such are the proofs as to when and how the plaintiff company and its predecessors came to make foam extinguishers. There is no proof as to the source from which the defendant company obtained its knowledge, but, as it was, during all the years the other company was selling foam extinguishers, itself selling soda and acid extinguishers, in

competition, and as the proofs heretofore quoted constrained it to confess that extinguisher was completely superseded by the foam extinguisher, it is quite clear that by 1922 it had become apparent to it that it must enter the foam field if it was to compete in hand extinguishers. Accordingly we find it entering such field in 1922, two years before the expiration of the Laurent patent.

On May 9, 1924, the plaintiff began this suit against the defendant, charging infringement of that patent. As it expired June 25, 1924, the suit is now limited to an accounting.

Turning, then, to Laurent's patent, we note that it is for an apparatus, or as it states, for a "hand fire extinguishing apparatus." The generic form of such invented apparatus Laurent thus describes: "This invention has for its object to provide a hand fire extinguishing apparatus of the kind in which two or more liquids, arranged separately in a common container, are caused to mingle in the case of fire so that they generate gases (carbonic acid) which expel the liquids in a powerful jet." He then refers to some defects of previous apparatus, and adds, "The defects are obviated by means of the present invention, *owing to the fact that it sprays foam instead of liquid*;" and, pointing out how such foam is produced, says: "The formation of the foam is produced by adding to one of the liquids (or to both of them) any appropriate viscous foam-forming substance. There are many such substances, but the most advantageous is extract of licorice root (succus liquiritæ)." It will here be noted that such generic invention and the elements thereof above disclosed are embodied in a generic claim as follows: "A fire-extinguishing apparatus, comprising a receptacle containing separated gas-producing fire-extinguishing substances and a foam-producing substance which causes the substances to produce a gas-filled foam simultaneously with the evolution of gases."

It will also be noted that the several elements of such quoted generic disclosure and the several elements of the quoted generic claim are shown in Figure 4, which he describes as being one where "the vessel *b* is divided into two compartments by means of a vertical partition *l*; one of these compartments serving for the reception of the vessel *a* containing the acid, while the other is charged with a soda solution." In addition to this generic, inclusive description, figure, and claim, Laurent showed in his specification by Figure 1 the possible use of his generic invention when, as noted in claim 5, it comprises the additional element

"of a receptacle having a ✶ ✶ ✶ mixing chamber." Having then in the same patent a generic claim in which the element of a mixing chamber does not appear and a specific claim in which it does appear, what is the applicable law of patent construction? Manifestly, the principle applicable to the construction of all contracts, viz. to give effect to every part of the contract. The claims granted in a patent are the sovereign's contract of exclusive ownership in consideration of a patentee's disclosure.

In Freeman Electric Co. v. General Electric Co., 191 F. 168, 169, this court said:

"There is nothing in the prior art that compels the restriction of the broad element of claim 1, viz., 'interior retaining means,' to the specific element of claim 2, viz., 'a yoke secured in the crown of the cap, and provided with arms extending within the interior of the cap.'

"Under such conditions, following our previous decision in Ryder v. Schlichter, 126 F. 487, 61 C. C. A. 469, we give effect to *all parts of the patent* by enforcing a construction that makes *both* generic and specific claims effective."

And in the National Cash Register Case (C. C. A.) 53 F. 367, 370, in words that have become hornbook patent law, it was said:

"There is nothing upon this record which would warrant us in attributing to the patentee the folly of having presented, and to the patent office the improvidence of having allowed, *two claims for the same thing.* The distinction between them must be maintained, that *both* may be given effect. ✶ ✶ ✶ This claim, as we read it, is, distinctly, exclusively and broadly, for a new combination; and we know of no authority or principle of law which, so reading it, would warrant us in converting it, by construction, into a claim for details merely."

As showing the consistent and persistent application in this circuit of this rule of construction, reference is made to Allen v. Wingerter (C. C. A.) 17 F.(2d) 745; Ryder v. Schlichter (C. C. A.) 126 F. 487; General Electric Co. v. Freeman Electric Co. (C. C.) 190 F. 34; Rollman Mfg. Co. v. Universal Hardware Works (D. C.) 207 F. 97; Whitaker v. Todd (C. C. A.) 232 F. 714.

Finding, then, that Laurent disclosed a specific apparatus whose general container had a mixing chamber, and was granted therefor claim 5 which had this limitation of "a mixing chamber," and that his claim 1 was broader, in that it had no limitation of

"a mixing chamber," it is clear that the element of a mixing chamber of claim 5 cannot be injected into claim 1 by judicial interpretation. Claim 1 is self-explanatory. There is no uncertainty in its words. There is no call for interpretation. Its clear words are a law unto themselves. In United States Glass Co. v. Atlas Glass Co. (C. C.) 88 F. 493, 500, affirmed by this court in 90 F. 724, it was urged that the plain terms of a self-explanatory claim should by judicial interpretation be so interpreted as to broaden it. It was there said, and we think the language is equally applicable where a claim, clear in its language, is sought to be narrowed by adding a limitation by interpretation: "When a claim, read in its common, ordinary meaning, is explicit and clear, when there is no apparent uncertainty, there is no room for construction. Rich v. Close, 4 Fish. Pat. Cas. 279, Fed. Cas. No. 11,757. * * * A court discharges its duty and exhausts its power when it ascertains and declares what was claimed."

Applying claim 1 as it reads, and not as limited to having a mixing chamber, it is clear that both the plaintiff's Foamite and the defendant's Phomene hand extinguishers are aptly described by claim 1, in that they both have the recited elements thereof, to wit, (1) "a fire-extinguishing apparatus;" (2) "comprising a receptacle;" (3) "containing separated gas-producing fire-extinguishing substance, and a foam-producing substance;" (4) "which causes the substances to produce a gas-filled foam simultaneously with the evolution of gases." So reading and applying the claim, infringement follows.

As the court below based its decision on noninfringement, it was not called on to pass on the validity of the patent. On that question we have the prima facies of the grant of the patent and the reversal by the Patent Office of its own previous holding that because, as stated in substance by the court below, "no invention was required to use the bubble-producing emulsion of Gates in the old soda and acid apparatus," the apparatus involved no invention. Originally Laurent sought to have granted the broad claim of "a fire-extinguishing apparatus, comprising a receptacle containing separated gas-producing fire-extinguishing substances." When his application was broadly rejected, not on account of his claims, but because of its lack of invention, he stood on his original application, and in the end succeeded. Clearly, he was right. It is true that Gates in the stationary apparatus of his patent showed the use of foam as a fire extinguisher, but, with that known, neither he nor others made the advance in the art which both the Foamite and Phomene apparatuses did. Nor did it occur to any one to reconstruct the soda and acid water extinguisher into a foam ejector. When Laurent showed that, his apparatus did what neither the old water hand apparatus or Gates' foam apparatus did; and it did it by utilizing generated gas to intermingle and "to produce a gas-filled foam simultaneously with the evolution of gases." He disclosed a new thing. This simultaneity of gas and gas-filled foam is described in the specifications, viz., "in the present instance the gas-filled foam is produced simultaneously with the evolution of gases, which greatly amplifies the apparatus," was called to the attention of the Office, and the simultaneity happily described in the amendment, viz.:

"The references cited do not anticipate applicant's invention, as in the present instance the gas-filled foam is produced simultaneously with the evolution of gases, which greatly amplifies the apparatus.

"In the patent 749,374 the gases are produced in advance and stored under pressure in a reservoir connected with the apparatus. When the apparatus shall act the gas is led from said reservoir through a soap-like emulsion. This is quite different from the present invention in which the gases in statu nascendi produce the gas-filled foam."

The original broad claim had added to it that which characterized the functional novelty of Laurent's apparatus as one "which causes the substances to produce a gas-filled foam simultaneously with the evolution of gases." The patent was promptly allowed and claim 1 granted. It is clear that the claim should have been so limited. The idea of a hand extinguisher, the tilting of one, the use of different ingredients to form gas, the capacity and use of foam as a fire extinguisher, were all well known; but Laurent made a functionally new use of all these known things when he made an apparatus such as is described in his generic claim, namely, one which while using "separated gas-producing fire extinguishing substances" such as the old acid and soda apparatus did, and a "foam-producing substance" such as Gates showed, was an apparatus which did what neither of the others did, namely, "causes the substances to produce a gas-filled foam simultaneously with the evolution of gases." It is this simultaneous evolution of old gases in a new relation with the old licorice which simultaneous-

*ly* evolves the gas for bubble-forming and foam ejecting. To my mind, it was this capacity and use of the apparatus that gave it patentable novelty; and I find it clearly outlined in the specification where Laurent describes his apparatus as "of the kind in which two or more liquids, arranged separately in a common container, are caused to mingle in the case of fire so that they may generate gases (carbonic acid) which expel the liquids in a powerful jet."

So viewing the patent, I would hold it valid and infringed.